# THE CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY v. MEANS.

[No. 8,086. Filed April 2, 1914. Rehearing denied April 2, 1915. Transfer denied June 24, 1915.]

1. APPEAL.— Ruling on Demurrer.— Briefs.— Sufficiency.— Appellant's brief containing the substance of the complaint and the statement that "appellant demurred to the appellee's complaint on the ground that the same did not state facts sufficient to constitute a cause of action", followed by a citation of the page and lines of the record where the demurrer is to be found, together with the statement that "the demurrer to the complaint was overruled and appellant excepted to the ruling", and a citation of the page and lines where such ruling is to be found, substantially complies with the requirements of Rule 22, so as to present for

review the questions raised by the assignment of error in the overruling of such demurrer. p. 387.

2. RAILROADS.—*Injuries to Children on Tracks.—Constructive Notice.—Duty of Railroad Company.*—Where a railroad switch was maintained near a public park in a densely populated part of a city to which children from the park and immediate vicinity were attracted by wheat which had leaked from cars, and such condition had existed for several years and was known, or by the use of reasonable diligence could have been known to the company, it owed to a five-year-old boy, attracted there by other boys gathering wheat, the duty to exercise ordinary care before moving cars standing on such switch, regardless of whether he was a trespasser, or a licensee by permission or invitation, or whether the case was within either the last clear chance or attractive nuisance doctrine, since the company had at least constructive knowledge of his presence in a situation of peril from which he was unable by reason of his infancy to extricate himself. pp. 387, 395, 399, 408.

3. NEGLIGENCE.—*Duty Toward Trespassers.*—The owner or occupant of premises, as a general rule, owes no duty to a trespasser thereon, except to refrain from wilfully or intentionally injuring him after discovery of his presence. p. 391.

4. NEGLIGENCE.—*Injury to Licensee.—Licensee by Permission.*—A licensee who enters on premises by permission only, without any enticement, allurement or inducement being held out to him by the owner or occupant, enters at his own risk and enjoys the license subject to its concomitant perils. p. 392.

5. NEGLIGENCE. — *Injury to Licensee. — Licensee by Invitation. — Duty of Owner or Occupant of Premises.*—The owner or occupant of premises owes to a licensee thereon by invitation the duty of making and keeping such premises in a reasonably safe condition, suitable for the use of such licensee while he remains thereon under such invitation, for a breach of which he is liable for resulting injury to such licensee, if the latter is free from contributory negligence. p. 393.

6. NEGLIGENCE.—*Injury to Licensee.—Liability.—Licensee by Permission.*—The owner of premises is not liable to a licensee by permission for injuries from mere passive negligence or owing to defects in the condition of the premises, since such a licensee, being one who for his own convenience, curiosity or entertainment goes upon the premises by permission or sufferance of the owner, is held to take the premises as he finds them. p. 393.

7. RAILROADS.—*Licensees.*—Licensees of a railroad company are persons who, being neither passengers, servants or trespassers, nor persons in any contractual relation to the company, are permitted to be upon its premises for their own interests, convenience or gratification. p. 393.

Cleveland, etc., R. Co. *v.* Means—59 Ind. App. 383.

8. NEGLIGENCE.—*Licensee by Invitation.*—A licensee by invitation is one who goes upon the land of another with the express or implied invitation of the owner or occupant, either to transact business with the owner or occupant, or to do some act which is of advantage to such owner or occupant, or of mutual advantage to both the licensee and the owner or occupant. p. 394.

9. NEGLIGENCE.—*Licensees.—Invitation.—Failure to Object.*—Mere acquiescence, or failure to object, is not in itself sufficient to sustain an inference that a licensee upon the premises of another was a licensee by invitation. p. 394.

10. NEGLIGENCE.—*Liability for Injuries to Licensee or Trespasser.* —Notwithstanding general rules, there are exceptional cases, though not subject to classification under either the last clear chance or attractive nuisance doctrine, wherein liability arises against the owner or occupant of premises for injuries to a child going thereon, whether as a trespasser or as a licensee by permission or invitation, from the fact of the presence of such child in a situation of peril and the knowledge of the owner or occupant, actual or constructive, of such child's presence in a perilous and helpless situation, and the resultant duty in view of such knowledge to use care. p. 398.

11. NEGLIGENCE—*Questions of Law or Fact.*—Whether a party sought to be charged with liability for negligence owed any duty to observe care toward the person injured is a question of law for the court, while the question of whether such duty was properly performed is a question of fact for the jury. p. 402.

12. RAILROADS.—*Children on Tracks.—Duty of Railroad Company.* —A railroad company owes no duty to keep a lookout for the presence of a child upon its tracks, but after knowledge of its presence, either actual or constructive, the company owes the duty of ordinary care to avoid injuring it. p. 402.

13. RAILROADS.—*Children on Tracks.—Duty of Railroad Company.* —A railroad company can not assume that a licensee of immature years will look after his own safety and will not place himself in a situation of peril while upon its premises, and constructive knowledge that children of tender age are on its tracks, or probably will be on its tracks at a particular place, carries knowledge of their peril or probable peril and helpless condition, so that in such case the vigilance or care required may become affirmative in character and call for the exercise for the child of the care and vigilance which the company must know that the child can not exercise for itself. (*Cannon* v. *Cleveland, etc., R. Co.* [1901], 157 Ind. 682, criticised.) p. 405.

14. RAILROADS.—*Children on Tracks.—Duty of Railroad Company.* —A railroad company is not an insurer of the safety of children

who come upon its premises; 'nor does it at all times and all places owe them the duty of any care, but its duty is simply that which attaches to every member of society undertaking to exercise a personal right in a manner which may affect the welfare or safety of another member, which is the obligation to use reasonable care; and such reasonable care does not impose any duty where the presence of a child on its tracks is merely possible, or where the exercise of such care would impose on the company an unreasonable limitation on the usual and ordinary use of its property. p. 407.

15. RAILROADS.—*Injuries to Children on Tracks.—Jury Questions.* —Where a railroad company was charged with constructive knowledge of the presence of children on its switch track and there was evidence to show that before moving one of its cars standing thereon, no signal or warning of any kind was given, the question of whether it exercised the degree of care that an ordinarily prudent person would have exercised, and whether the lack of such care was the proximate cause of the death of one of the children, were questions of fact for the jury. p. 411.

16. RAILROADS.—*Injuries to Children on Tracks.—Contributory Negligence.—Jury Question.*—The questions of whether a mother was negligent in permitting her five-year-old child to go to a public park near a railroad switch track in the care of his twelve-year-old brother, and whether the brother was negligent in going upon the switch track, were for the jury, in view of evidence to support the averments of the complaint as to such questions. p. 411.

17. APPEAL.—*Review.—Evidence.—Sufficiency.*—In determining the sufficiency of the evidence to sustain the verdict, the court on appeal is required to look only to that evidence most favorable to appellee p. 412.

18. APPEAL.—*Review.—Verdict.—Conclusiveness.*—A general verdict supported by some evidence is conclusive on the question of the sufficiency of the evidence. p. 415.

From Superior Court of Marion County (82,554) ; *Willard New,* Judge *Pro Tem.*

Action by Hannah Means against The Cleveland, Cincinnati, Chicago and St. Louis Railway Company. From a judgment for plaintiff, the defendant appeals. *Affirmed.*

*Frank L. Littleton, Leonard J. Hackney* and *Charles P. Stewart,* for appellant.

*Emrick & Deupree* and *B. F. Watson,* for appellee.

HOTTEL, J.—This was a suit by appellee to recover damages for the death of her infant son, alleged to have been caused by appellant's negligence. A complaint and an answer of general denial presented the issues of fact. A trial by jury resulted in a verdict for appellee for $400. A demurrer to the complaint, a motion for a peremptory instruction, and a motion for a new trial were each overruled and these several rulings are each separately assigned as error, and relied on for reversal.

Appellee insists that appellant has waived the error, if any, resulting from the ruling on the demurrer to the complaint because of its failure to set it out in its brief.

1. The brief states that "appellant demurred to the appellee's complaint on the ground that the same did not state facts sufficient to constitute a cause of action", and follows with a citation of the page and lines of the record where such demurrer will be found. It then states that "the demurrer to the complaint was overruled and appellant excepted to the ruling", and cites the page and lines of the record where such ruling will be found. This is a substantial compliance with Rule 22 of the Supreme Court and this court. The substance of the complaint, the ground of the demurrer thereto, and the ruling thereon, all being disclosed by the brief, the court has clearly before it the question which it is called on to determine, without reference to the record, and this is all that said rule, or any construction placed thereon by the Supreme Court or this court, contemplates.

The other rulings complained of present one and the same question. The complaint follows, as far as applicable, the complaint in the case of *Indianapolis Water Co.* v.

2. *Harold* (1908), 170 Ind. 170, 83 N. E. 993, and is, we think, sufficient. In any event, it avers in terms favorable to appellee and her recovery, all the essential facts disclosed by the evidence, and the most serious question presented by the appeal is that of the sufficiency of the evi-

dence to sustain the verdict. We therefore go direct to this question. The facts disclosed both by the complaint and the evidence about which there is little or no dispute, are in substance as follows: The appellant is a corporation organized under the laws of the State of Indiana, and owns and operates railroad lines therein. On August 10, 1910, and for a long time prior thereto, it owned and operated several of its lines of railroad in and through the city of Indianapolis, and owned and maintained switches in connection therewith, at all times, herein mentioned. One of the switches extended from a track laid in North Missouri Street in said city, formerly known as the main line of the Chicago division of defendant's railroad system, thence in a westerly direction on the south embankment of the canal of the Indianapolis Water Company to the manufacturing establishment of Love Brothers. Said switch track crossed West Street and Blackford Street, in said city. On said date, and for a long time prior thereto, the city maintained a public park, called Military Park immediately north of said canal, the park being bounded on the west by Blackford Street, on the east by West Street and on the north by New York Street. The park is situated in a densely populated part of the city and was at that time, and for years prior thereto had been attractive to the children in the immediate vicinity of the park as a playground, and during the summer and autumn months children congregated in great numbers in the park and the vicinity thereof to play. The southwest corner of the park was within seventy-five feet of the above described railroad track, or switch, at the point where the same crossed Blackford Street. On the afternoon of August 10, 1910, appellant had ten cars coupled together standing on the switch, one of which cars was within thirty feet of Blackford Street. Some of the cars were so placed for the use and benefit of the Acme-Myers Milling Company, located at the corner of the railroad track and Blackford Street. At the time herein referred to a

number of said cars had been unloaded by the milling company, but quantities of wheat still remained in all of the cars and some of them were yet loaded with wheat. Wheat had leaked from the cars to the ground around and under the cars and near and on the track where the cars were standing. This condition, with the exception of the number of cars standing on the track, had existed for several years, and on August 10, 1910, and during all of said time prior thereto the wheat, on the track and in the unloaded cars, attracted and had attracted children from the park and its immediate vicinity, who played about the cars and track and collected and gathered up the waste wheat from the empty cars and from appellant's ground and tracks. In gathering the wheat, said children, at times, would be under and between the cars where a sudden movement of them would expose them to great danger. Appellant, on August 10, 1910, and for sometime prior thereto knew or by the use of reasonable diligence could have known of said facts. On the afternoon of said day, appellee's son, Joseph Minnehan, deceased, who was five years of age and living with appellee then a short distance from the park, was permitted by her to go to the park with an older brother twelve years of age. After the boys reached the park they with other boys were attracted and induced to leave the park and go upon the railroad track by seeing other children playing about the cars and gathering wheat thereunder. These boys, including decedent, proceeded to play and pick up and collect wheat under the cars to which there was at that time no engine attached. While the boys were so playing and gathering wheat from beneath and in said cars, and while said Joseph Minnehan was standing between the first and second cars from Blackford Street and about eighty feet from the street watching the other boys gathering wheat, at 2:30 p. m. on said day, appellant, in attempting to couple thereon, negligently and carelessly caused an engine pushing six cars to run against the ten cars standing

on said track, and the impact caused the ten cars to move westward and thereby knocked decedent down on the rail off the track and further caused the second car to pass over him, amputating both his legs and one arm from which injuries he died. Appellant, before causing the cars to be moved, carelessly and negligently failed and neglected to give decedent or any of the boys any warning of any kind of their danger, although appellant knew that the condition of the cars placed upon the track, and the other heretofore described conditions, had induced and attracted boys to be at the place for several years prior to that day, and knew that children were gathering wheat and playing under and near the cars at the time, or by the use of reasonable diligence could have learned of the condition and facts and the danger to said Joseph Minnehan, by reason thereof. Appellee did not know of the existence of the conditions heretofore described, or that decedent, on account thereof, had been attracted from the park, but believed during all the time, from the time she gave her consent for her said son to go to the park to play until she was notified of his said injuries that he was at the park. The day on which decedent was injured was unusually warm and the conditions aforesaid were naturally inclined to attract a child, and being without warning of danger, and of immature judgment, he was thereby attracted to his death. On account of his tender years said child was *non sui juris*, and incapable of appreciating the danger there was in being between the cars. Appellant caused the six cars to be pushed by the engine into said ten cars, knowing when it did so, that children were likely to be playing and gathering wheat at the place where the ten cars were standing, and without making any effort to discover whether children were playing and gathering wheat and without giving such children any notice or warning of the approach of such engine and cars.

Are these facts sufficient to show a liability on the part of appellant for the injury resulting in the death of appel-

lee's child? Appellant answers, no, and files a brief in support of such answer in which it cites numerous authorities, many of which give apparent support to its contention. Appellee· makes an affirmative answer and furnishes a brief also well supported by authority. Our own investigation of the question convinces us that either party might have added materially to the number of authorities cited in support of the respective contentions. There is in these cases a great divergence of opinion and apparent conflict. However, it should be said, in this connection, that such apparent conflict, generally speaking, does not result from any different announcement of general principles ordinarily applicable and controlling in such cases, but, from the application made of such principles to the facts of the particular case, and in some instances, from the reasons given for applying or refusing to apply the particular general rule to the particular case, or the reason given for placing such cases within some exception to such general rule or rules.

Appellant seeks to relieve itself from liability on the ground that appellee's decedent, when injured, was on its premises as a trespasser, or, at most, as a licensee by sufferance, permission or passive acquiescence only. Speaking generally, it is no doubt true, as appellant, in effect contends, that the duty of the owner or occupant of premises to a person injured thereon, depends largely on whether such person was there as a trespasser, or as licensee by permission or passive acquiescence only or as a licensee by the inducement or invitation express or implied of such owner or occupant. The duty of the owner of the premises toward a person injured thereon as affected by such respective relations between him and such owner, has been frequently recognized by the courts of this State and other jurisdictions to be, in general terms as follows: The owner

3. or occupant of premises owes no duty to the trespasser thereon, except to refrain from wilfully or intentionally injuring him after discovery of his presence.

*Cannon* v. *Cleveland, etc., R. Co.* (1902), 157 Ind. 682, 688, 62 N. E. 8; *Lingenfelter* v. *Baltimore, etc., R. Co.* (1900), 154 Ind. 49, 52, 55 N. E. 1021; *Faris* v. *Hoberg* (1893), 134 Ind. 269, 276, 33 N. E. 1028, 39 Am. St. 261; *Manlove* v. *Cleveland, etc., R. Co.* (1902), 29 Ind. App. 694, 700, 65 N. E. 212; *Chicago, etc., R. Co.* v. *Martin* (1903), 31 Ind. App. 308, 318, 65 N. E. 591; *South Bend Iron Works* v. *Larger* (1894). 11 Ind. App. 367, 370, 39 N. E. 209; *Dull* v. *Cleveland, etc., R. Co.* (1899), 21 Ind. App. 571, 594, 52 N. E. 1013, and cases cited; *Terre Haute, etc., R. Co.* v. *Graham* (1884), 95 Ind. 286, 48 Am. Rep. 719; *Parker* v. *Pennsylvania Co.* (1893), 134 Ind. 673, 34 N. E. 504, 23 L. R. A. 552; *Pennsylvania Co.* v. *Meyers* (1894), 136 Ind. 242, 36 N. E. 32; *Ivens* v. *Cincinnati, etc., R. Co.* (1885), 103 Ind. 27, 2 N. E. 134; *Cleveland, etc., R. Co.* v. *Stephenson* (1894), 139 Ind. 641, 37 N. E. 720; *Redigan* v. *Boston, etc., R. Co.* (1891), 155 Mass. 44, 28 N. E. 1133, 31 Am. St. 520, 14 L. R. A. 276; *Martin* v. *Chicago, etc., R. Co.* (1902), 194 Ill. 138, 62 N. E. 599; *Lucas* v. *Richmond, etc., R. Co.* (1889), 40 Fed. 566; *Cleveland, etc., R. Co.* v. *Tartt* (1894), 64 Fed. 823, 12 C. C. A. 618; *Weldon* v. *Philadelphia, etc., R. Co.* (1899), 2 Pen. (Del.) 1, 43 Atl. 156; *Spicer* v. *Chesapeake, etc., R. Co.* (1890), 34 W. Va. 514, 12 S. E. 553, 11 L. R. A. 385; *June* v. *Boston, etc., R. Co.* (1891), 153 Mass. 79, 26 N. E. 239; *Wright* v. *Boston, etc., R. Co.* (1886), 142 Mass. 296, 7 N. E. 866. "A licensee, who enters on premises by permission only, without any enticement, allurement or inducement being held out to him by the owner or occupant * * * goes there at his own risk, and enjoys the license subject to its concomitant perils." *Sweeny* v. *Old Colony, etc., R. Co.* (1865), 92 Mass. 368, 87 Am. Dec. 644. See also, *Lary* v. *Cleveland, etc., R. Co.* (1881), 78 Ind. 323, 326, 328, 41 Am. Rep. 572, and cases cited; *Carleton* v. *Franconia Iron, etc., Co.* (1868), 99 Mass.

216; *Harris* v. *Stevens* (1858), 31 Vt. 79, 90, 73 Am. Dec. 337; *Wood* v. *Leadbitter* (1845), 13 M. & W. *838.

To a licensee on his premises, *by invitation,* the master or occupant assumes an obligation of making and keeping such premises in a reasonably safe condition, suitable

5. for the use of such licensee while he remains thereon, under such invitation, and for a breach of this obligation he is liable in damages to a person injured thereby, who is himself free from contributory negligence. *Sweeny* v. *Old Colony, etc., R. Co., supra; Nave* v. *Flack* (1883), 90 Ind. 205, 207, 46 Am. Rep. 205; *Hawkins* v. *Johnson* (1886), 105 Ind. 29, 34, 4 N. E. 172, 55 Am. Rep. 169; *Indiana, etc., R. Co.* v. *Barnhart* (1888), 115 Ind. 399, 408, 16 N. E. 121, and cases cited; *Evans* v. *Adams Express Co.* (1890), 122 Ind. 362, 23 N. E. 1039, 7 L. R. A. 678.

In this connection it is important to know what persons are, in legal contemplation, licensees by permission only, and what persons are licensees by inducement or in-

6. vitation express or implied. On this subject the courts of different jurisdictions have expressed themselves as follows: A licensee by permission is one who, for his own convenience, curiosity or entertainment, goes upon the premises of another by his (the owner or occupant's) permission or sufferance. Such a person takes the premises as he finds them as to any defects therein, and the owner is not liable for any injuries resulting to him owing to defects in the conditions of the premises. He is not liable for *passive* negligence. *Lingenfelter* v. *Baltimore, etc., R. Co., supra; Lary* v. *Cleveland, etc., R. Co., supra; Evansville, etc., R. Co.* v. *Griffin* (1885), 100 Ind. 221, 223, 50 Am. Rep. 783; *Indermaur* v. *Dames,* 1 C. C. P. (Law Reports, 1865) 280. Licensees of a railroad company

7. have been defined to be those persons who, being "neither passengers, servants, nor trespassers, and not standing in any contractual relations to the railway,

are permitted by the railway to come upon its premises for their own interests, convenience or gratification''. Patterson, Railway Accident Law §184. See, also, *Woolwine* v. *Chesapeake, etc., R. Co.* (1892), 36 W. Va. 329, 15 S. E. 81, 32 Am. St. 859, 860, 869, 16 L. R. A. 271. A licensee by invitation is a person who goes upon the lands of another with the express or implied invitation of the owner or occupant, either to transact business with such owner, or occupant, or to do some act which is of advantage to him (the owner or occupant) or of mutual adtage to both licensee and the owner or occupant of the premises. An invitation is implied from such a mutual interest. The distinction recognized by the authorities generally appears to be that a license by ''invitation is inferred where there is common interest or mutual advantage, while a license (by permission) is inferred when the object is the mere pleasure or benefit of the person using it.'' Campbell, Negligence §§32, 33. See, also, Black, Law & Pr. in Accident Cases §13; *Pomponio* v. *New York, etc., R. Co.* (1895), 66 Conn. 528, 537, 34 Atl. 491, 50 Am. St. 124, 32 L. R. A. 530. ''The law will not infer that the injured party was induced to enter, except the facts are sufficient to show an express or implied invitation. Mere acquiescence, or failure to object, is not sufficient to sustain such an inference.'' *Morrow* v. *Sweeney* (1894), 10 Ind. App. 626, 634, 38 N. E. 187. The distinction above indicated between the duty which the owner or occupant of premises owes to a licensee by permission and a licensee by invitation in respect to keeping such premises safe for their use is recognized and discussed in the following cases, among many others: *Plummer* v. *Dill* (1892), 156 Mass. 426, 427, 31 N. E. 128, 32 Am. St. 463; *Nicholson* v. *Erie R. Co.* (1870), 41 N. Y. 525, 532; *Barry* v. *New York, etc., R. Co.* (1883), 92 N. Y. 289, 44 Am. Rep. 377; *Byrne* v. *New York, etc., R. Co.* (1887), 104 N. Y. 362, 10 N. E. 539, 58 Am. Rep. 512; *Sweeny* v. *Old Colony, etc., R. Co.,*

*supra; Gordon* v. *Cummings* (1890), 152 Mass. 513, 25 N. E. 978, 23 Am. St. 846, 9 L. R. A. 640.

While the rules before indicated relating to the duty of the owner or occupant of premises to the trespasser and a licensee thereon, are generally applicable in cases of the character here involved it does not follow that there are no exceptions thereto. They, like all other general rules, have their exceptions, as is evidenced by the many cases decided by the courts of appeal of this State as well as those of many other jurisdictions to which have been applied the doctrine of last clear chance and the attractive nuisance doctrine, concerning which we will have more to say later on in this opinion.

Our investigation of this question leads us to conclude that much of the apparent confusion in the exceptional cases in different jurisdictions has arisen from an effort

2. to put the injured party in the particular case in one or the other of said relations to the owner of the premises and in then applying the general rule applicable to such relation, when in fact such particular relationship was not necessarily important; but rather the true and ultimate test of actionable negligence in each case should have been, Did the owner of the premises under the particular circumstances of the case involved owe *any duty* to the party injured on his premises and, if so, was such duty violated and, did such violation result in the injury complained of? Probably no question of law presents a greater diversity of opinion, and expression thereof, among the courts of different jurisdictions than the question whether a railroad company owes to the trespasser on its tracks, whether adult or a child *non sui juris*, any duty of care or vigilance to discover such presence. In the case of *Palmer* v. *Oregon Short Line R. Co.* (1908), 34 Utah 466, 98 Pac. 689, 16 Ann. Cas. 229, the learned judge who wrote the opinion collected and properly grouped many of the authorities giving expression to said several holdings of the courts of different jurisdic-

tions on said questions. As stated in that opinion it will be found from an examination of the cases there cited that some jurisdictions expressly hold that a railroad company owes even to the adult trespasser the duty of some care and vigilance to discover his presence on the track, but such cases are found mainly in those jurisdictions where the duty to observe such care has been imposed by statute. For authorities so holding see said case, pp. 482, 483. Other jurisdictions hold in effect that no duty rests upon a railroad company to keep a lookout for trespassers whether young or old. For list of such authorities, see said case, pp. 477, 478. Some of the cases there cited disclose that the rule which they are cited to support has been strictly applied even to adult *licensees* and regardless of the place where the injury was inflicted whether in town or country.

There is then what has been termed in some jurisdictions an intermediate rule applied both to trespassers and licensees, which, in *Palmer* v. *Oregon Short Line R. Co.*, *supra* 479, is stated as follows: Where a railroad company "has permitted the public the free use of the tracks to pass along or over, and this use is open and continued for a long period of time and by a large or considerable number of people, or where the railroad runs through thickly populated portions of a city, town, or village where people frequently go upon or pass over the tracks for such a length of time that the employes of the railroad company may be charged with notice, or when such notice is directly given them, then in all such cases, although the injured person be a trespasser, still the railroad company, having reason to expect that some one may be on or near the track, must act accordingly, and keep a lookout and give timely warning in order to prevent a collision, and a failure to exercise ordinary care in keeping a lookout and in giving warning may be negligence for which even a trespasser is entitled to recover, provided he is not guilty of contributory negligence which is the proximate cause of the injury. In cases of

adults being at such place, the employes of a railroad company are not required to either check the speed of the train or to stop it as soon as they discover the intruder. All that is required of them in the first instance is to give timely warning of the approach of the train. On giving such warning they have the right to assume that the intruder will leave the track. In case of children or infants, however, they may not indulge such a presumption, but must at once arrest the speed of the train as soon as they discover the children, or, by the exercise of ordinary care, ought to have discovered them, on the track or in a place of danger. This also applies to helpless adults who may be on the track or in a place of danger, when their helplessness is discovered, or, by the exercise of ordinary care, ought to be discovered.'' *Erie R. Co.* v. *Swiderski* (1912), 197 Fed. 521, 117 C. C. A. 17; *Snare & Triest Co.* v. *Friedman* (1909), 169 Fed. 1, 94 C. C. A. 369, 40 L. R. A. (N. S.) 367; *Alabama, etc., R. Co.* v. *Guest* (1905), 144 Ala. 373, 39 South. 654; *Southern R. Co.* v. *Chatman* (1905), 124 Ga. 1026, 53 S. E. 692, 6 L. R. A. (N. S.) 283, 4 Ann. Cas. 675; *Louisville, etc., R. Co.* v. *Daniel* (1906), 122 Ky. 256, 91 S. W. 691, 3 L. R. A. (N. S.) 1190; *Green* v. *Chicago, etc., R. Co.* (1896), 110 Mich. 648, 68 N. W. 988; *Bouwmeester* v. *Grand Rapids, etc., R. Co.* (1887), 67 Mich. 87, 34 N. W. 414; *Smalley* v. *Southern R. Co.* (1899), 57 S. C. 243, 35 S. E. 489; *Fearons* v. *Kansas City, etc., R. Co.* (1904), 180 Mo. 208, 79 S. W. 394; *Chesapeake, etc., R. Co.* v. *Rogers* (1902), 100 Va. 324, 41 S. E. 732; *Illinois Cent. R. Co.* v. *Murphy* (1906), 123 Ky. 787, 97 S. W. 729, 11 L. R. A. (N. S.) 352; *Johnson* v. *Lake Superior, etc., Transfer Co.* (1893). 86 Wis. 64, 56 N. W. 161; *Johnson* v. *Louisville, etc., R. Co.* (1906), 122 Ky. 487, 91 S. W. 707; *Davis* v. *Chicago, etc., R. Co.* (1883), 58 Wis. 646, 17 N. W. 406, 46 Am. Rep. 667; *Cassida* v. *Oregon R., etc., Co.* (1887), 14 Or. 551, 13 Pac. 438; *Felton* v. *Aubrey* (1896), 74 Fed. 350, 20 C. C. A. 436; *Atchison, etc., R. Co.* v. *Smith* (1882),

28 Kan. 541; *Givens* v. *Kentucky Cent. R. Co.* (1891), 12 Ky. L. Rep. 950, 15 S. W. 1057; *Martin* v. *Hughes Creek Coal Co.* (1912), 70 W. Va. 711, 75 S. E. 50, 41 L. R. A. (N. S.) 264, and annotations; *Smalley* v. *Rio Grande, etc., R. Co.* (1908), 34 Utah 423, 98 Pac. 311; *Young* v. *Clark* (1897), 16 Utah 42, 50 Pac. 832; *Hyde* v. *Union Pacific R. Co.* (1891), 7 Utah 356, 26 Pac. 979. Another able discussion of the question under consideration and valuable collection both of the decided cases and the expression of the law writers applicable thereto will be found in the case of *Edgington* v. *Burlington, etc., R. Co.* (1902), 116 Iowa 410, 90 N. W. 95, 57 L. R. A. 561, and annotations.

In many of these cases to which the attractive nuisance doctrine and the doctrine of last clear chance have been applied, where children have been involved, a careful 10. examination and scrutiny of the facts upon which they rest will disclose that such duty to observe care is not, necessarily, dependent on a contractual relation between the parties, nor does it necessarily depend on any consideration of benefit received or to be received, by either from the other, or any promise, inducement or invitation, express or implied, extended by the one to the other, but it will be found that such duty, in its last analysis, arises out of the emergency and necessities presented by the facts of the particular case and rests primarily upon, and has its origin in an inherent sense of justice and humanity present in every civilized and enlightened people which places so high a regard on life and limb that it will not permit their possessor, when helpless and in a situation of peril, to be deprived of the one or injured in the other by an affirmative act of negligence of another in the use of his property when such person *has knowledge*, actual or constructive of the helpless and perilous situation of the former, without charging such person with the damages resulting from such negligence, even though the possessor of such life or limb may have been guilty of a negligent act that was a remote cause

of such injury, in that such negligent act brought him into such place, or situation of peril. In other words, the duty or debt of care in such cases may arise from the fact of the presence of such child on such premises in a situation of peril, and the *knowledge* of the owner thereof, actual or constructive, of his perilous situation. In such cases such *knowledge* imposes on such owner the duty of observing the maxim old as the civil law, *sic utere tuo ut alienum non laedas,* etc., from which duty such owner can not divorce himself regardless of the relation that such person in peril may sustain to him, whether as trespasser, or licensee by permission or invitation. This maxim lies at the bottom of all these exceptional cases, whether found in the class designated "last clear chance" cases, or in the class designated "attractive nuisance" cases, and it will be found from a careful examination of the facts upon which such cases rest that said maxim has in each case been called into operation by reason of the *knowledge,* actual or constructive, on the part of the owner of the premises of the perilous and helpless situation and exposure to danger of the person on, or likely to come on such premises.

Appellee insists that this case falls within that class to which the attractive nuisance doctrine has been applied. With this contention we agree to the extent only that

2. the case is controlled by the maxim just indicated; otherwise such doctrine has no application to the facts of this case, except in the sense hereinafter indicated. Our understanding and interpretation of the cases to which the attractive nuisance doctrine has been applied, leads us to the conclusion that, strictly speaking, such doctrine has application to those cases only where the injury itself results from and is proximately caused by the appliance, machinery, instrument or thing relied on as the attractive nuisance, and does not apply to injuries resulting from some affirmative negligence of the owner of such premises separate from and in no way connected with such nuisance. Indeed,

there seems to be, in some jurisdictions, a disposition to limit such doctrine to "cases of attractive and dangerous machinery" (*Wheeling, etc., R. Co.* v. *Harvey* [1907], 77 Ohio St. 235, 83 N. E. 66, 75, 122 Am. St. 503, 19 L. R. A. [N. S.] 1136, and authorities cited), but for the purposes of this case we need not indicate any holding on this particular phase of this question. If the wheat in the cars and along the track, which constitutes the attractive nuisance relied on in this case, has any importance on the question here involved, it must be that only of furnishing a reason for the presence of children, decedent included, on the appellant's premises, and does not furnish the proximate cause of decedent's death. The proximate cause of such death was the separate, independent affirmative act of appellant in running its car against and over decedent, and with such act the alleged attractive nuisance was in no way connected, except as hereinafter indicated. We seriously doubt whether the facts disclosed by the complaint and the evidence show anything on, or any condition of appellant's premises that could be said to be so luring and inviting as to constitute an attractive nuisance, within the meaning of any of the cases relied on by appellee. Certainly nothing appears from the evidence that could be construed as an invitation, by appellant, express or implied to decedent, and those with him, to come on such premises. If so, then a similar invitation is extended by every farmer near a town or city, who permits the fruit of his peach or apple orchard to ripen on the trees and fall upon the ground and attract the boys from such town or city. Such ripe or fallen fruit would doubtless be a temptation to such boys but not necessarily an invitation to them by the owner to come on his premises to get them. The fact that boys for a number of years had frequently gone on appellant's premises to gather up the wheat, might show such knowledge of, and acquiescence in, such conduct and habit of such boys as to amount to a license or permission by appellant to come upon such premises, and therefore

make them licensees by permission rather than trespassers, but no invitation, express or implied, could be inferred from such conduct alone. Under the definitions above indicated of a licensee by invitation, and a licensee by permission, we are of the opinion that, giving to appellee the benefit of an interpretation of the evidence most favorable to her contention, her deceased son was on appellant's tracks when killed as a licensee by permission only.

While, under some of the decisions above cited, it may be important to determine whether the deceased when injured was on appellant's premises as a *licensee* rather than as a *trespasser*, under the facts of this case and the decisions applicable thereto, we are of the opinion, for the reasons herein indicated, that the other question, viz., whether he was on such premises as a *licensee by permission*, or as a *licensee by invitation*, is not of controlling importance. The facts show that he was there and, that the appellant and its agents had every reason to *know* or *anticipate* that he, or some other child would probably be on its tracks at the time it moved the cars that caused the fatal injury.

As affecting the question of proximate cause of decedent's death the doctrine of last clear chance comes more nearly being applicable to this case than the attractive nuisance doctrine. Indeed, the facts of this case by analogy warrant the application of such doctrine, even though the decedent be regarded as a trespasser, if we should follow to its logical conclusion the rule adopted in some jurisdictions and, in fact, in some of the more recent cases of this court and the Supreme Court. However, confusion is likely to result from and, in our judgment, much of that found in the decided cases has resulted from an effort to classify and bring exceptional cases within a particular class to which one of said suggestive names has been given, rather than to measure and judge them by the fundamental maxim and test above indicated which is applicable alike to all the exceptions.

Applying to this case this maxim and test, we ask, Did the appellant owe to decedent a duty to observe ordinary care toward him? Whether such a duty existed in this, or in any case, is a question of law for the court, while the question whether such duty was properly performed is a question of fact for the jury. However, in discussing this question and the decisions which throw light on it, we will, of necessity, be required to refer to the law as it has been applied to said relations of trespasser and licensee between the railroads and the party injured thereon, because in most instances the decisions discuss the question from such standpoint.

Some of the cases above cited indicate that a railway company owes a higher duty to the infant trespasser on its tracks than it does to the adult trespasser, even in the matter of the exercise of care and vigilance to discover his presence on the track; but the appellate tribunals of this State seem to be committed to the doctrine, and correctly we think, that as to the duty of discovery on its premises, when it has no knowledge, actual or constructive, of such presence or probable presence the duty of the railway company is the same as to both, viz., such company owes no duty to either to keep a lookout for his presence, but it owes to each the duty of ordinary care after there is knowledge of such presence, actual or constructive, and ordinary care may require care different in kind and greater in degree where a child of tender years is involved. *Indianapolis, etc., R. Co.* v. *Pitzer* (1887), 109 Ind. 179, 182, 185, 6 N. E. 310, 10 N. E. 70, 58 Am. Rep. 387, and authorities there cited; *Penso* v. *McCormick* (1890), 125 Ind. 116, 120, 25 N. E. 156, 21 Am. St. 211, 9 L. R. A. 313; *Wabash R. Co.* v. *DeHart* (1903), 32 Ind. App. 62, 65 N. E. 192; *Chicago, etc., R. Co.* v. *Fox* (1906), 38 Ind. App. 268, 274, 275, 70 N. E. 81. See, also, *Barrett* v. *Southern Pac. Co.* (1891), 91 Cal. 296, 27 Pac. 666, 25 Am. St. 186; *Twist* v. *Winona, etc., R. Co.* (1888), 39 Minn. 164, 167,

39 N. W. 402, 12 Am. St. 626; *Palmer* v. *Oregon Short Line R. Co., supra; Edgington* v. *Burlington, etc., R. Co., supra.*

The exception to the rule announced in favor of infant trespassers in some of the cases requiring vigilance to discover their presence on the track of a railroad company results from confounding the duty owing to such trespassers with their contributory negligence, and as was said in the case of *Nolan* v. *New York, etc., R. Co.* (1855), 53 Conn. 461, 474: "We do not think that the tender age * * * of one of these plaintiffs can have the effect to raise a duty where none otherwise existed. The supposed duties have regard to the public at large, and cannot well exist as to one portion of the public and not to another under the same circumstances. In this respect children, women and men are upon the same footing. In cases where certain duties exist infants may require greater care than adults, or a different kind of care; but precautionary measures having for their object the protection of the public, must, as a rule, have reference to all classes alike." If any other rule were adopted than that here indicated, it would "result in requiring the railroad company to keep a lookout always and everywhere for trespassers, and the presumption of a clear track would be entirely ignored". *Palmer* v. *Oregon Short Line R. Co., supra.*

The line of cases, however, which adopt the middle ground above indicated, in which we think we may include those of the courts of this State, all recognize that where the person on the track is a child *non sui juris* of whose presence the railroad company has *knowledge,* actual or *constructive,* a different rule obtains. In such case the company must operate its cars on such tracks with reference to the probable presence of such child and use ordinary care to avoid injuring it, otherwise no additional care is imposed on the company over that which it owes to the adult trespasser on its tracks.

Appellant concedes, in effect, that there is some evidence

in the case which would warrant the inference that decedent was on appellant's premises when killed by its sufferance, permission or active acquiescence and hence was a licensee by permission, but, that it owed him "no active vigilance". The form of expression here used is that used in many of the adjudicated cases and implies that some vigilance not active in character, is required in such cases even in favor of the adult licensee. This is the effect of the holdings in most jurisdictions. *Pomponio* v. *New York, etc., R. Co., supra; Woolwine* v. *Chesapeake, etc., R. Co., supra; Sweeny* v. *Old Colony, etc., R. Co., supra; Beck* v. *Carter* (1877), 68 N. Y. 283, 23 Am. Rep. 175; *Barry* v. *New York Cent. R. Co.* (1883), 92 N. Y. 289, 44 Am. Rep. 377; *Stevens* v. *Nichols* (1892), 155 Mass. 472, 29 N. E. 1150, 15 L. R. A. 459; *Corrigan* v. *Union Sugar Refinery* (1868), 98 Mass. 577, 96 Am. Dec. 685; *Steward* v. *Harvey College* (1866), 94 Mass. 58, 67; *Gallagher* v. *Humphrey* (1862), 6 L. T. (N. S.) 684; *Sullivan* v. *Waters* (1864), 14 Ir. C. L. 460, 474; *Indermaur* v. *Dames, supra; Corby* v. *Hill* (1858), 4 C. B. (N. S.) 556, 93 E. C. L. 556; 18 Am. and Eng. Ency. Law (2d ed.) 1136, 1137. These authorities authorize the statement that, generally speaking, such licensee, while on the premises, must take them as he finds them with all their risks and dangers; and that the owner owes him no duty of making any active effort to discover his presence or the danger of his particular surroundings at any particular time while on such premises but, if the owner discovers his presence and sees him in a situation of peril, he may not do an affirmative act which might reasonably be expected to increase such peril. The rule thus stated, even when applied to adults, should have few, if any exceptions.

All the authorities agree that the care which the owner of the premises owes to a child thereon by his acquiescence is different in kind and greater in degree than that which he owes to the adult under like circumstances. For an instructive discussion of and citation of authorities in sup-

port of this statement see *Edgington* v. *Burlington, etc., R. Co., supra.* So we say that by analogy constructive knowledge of the presence of a child licensee in a position of peril imposes at least as much affirmative care on the part of the owner of such premises before he does an affirmative act that might imperil the life or limb of such child as would actual knowledge of the presence of a helpless trespasser in a position of peril on such premises impose on such owner before doing an affirmative act to increase the peril of such trespasser.

The owner of the premises owes the adult licensee no duty of active vigilance to discover his presence or his surroundings while on his premises by permission only, because such adult is presumed to go 'there with the understanding that he will take the premises as they are, with all the uses to which the owner may subject them while there, and that he will look after his own safety and welfare, and that he has discretion and judgment to do so. In other words, the owner of the premises does not know and has no reason to anticipate that such adult licensee will place himself in a situation of peril. To indulge such an assumption when a child licensee of immature years, judgment and discretion is involved would be against our common understanding and reason and lacking in every element of humanity and justice. Constructive knowledge on the part of a railroad company that children *non sui juris* are on its tracks, or probably will be on its tracks, at a particular place, of necessity, carries with it knowledge of the peril or probable peril and helpless condition of such children, and hence the vigilance or care, which in the first instance was only negative in character, may become affirmative in the second instance and require that the company in such case shall, in some degree, at least, exercise for the child the care and vigilance which it must *know* the child is unable to exercise for itself, and, must not, *by an affirmative act* of omission or commission, expose such child to a danger

which it *knows,* or has reason to believe is unknown to and not understood or appreciated by such child. The duty of ordinary care which the owner of premises owes to the child licensee thereon is recognized and affirmed even in those jurisdictions which refuse to recognize or apply the attractive nuisance doctrine, as evidenced by the case of *Wheeling, etc., R. Co.* v. *Harvey, supra.* On this subject the court in that case in its criticism of a case which applied the turntable doctrine said: "The decision in that case did not require the application of the doctrine of the turntable cases, but rests upon long-settled principles of law. * * * The boys were held to be licensees, * * * it was the duty of the company to warn them of the hidden peril, or to use care that they were not injured thereby. In the opinion [*Harriman* v. *Pittsburgh, etc., R. Co.* (1887), 45 Ohio St. 11, 31, 12 N. E. 451, 4 Am. St. 507] Williams, J., says, 'Hence where a railroad company has for a long time permitted the public, including children, to travel and pass habitually over its road, at a given point, without objection or hindrance, it should, in the operation of its trains, and management of its road, so long as it acquiesces in such use, be held to anticipate the continuance thereof, and is bound to exercise care accordingly, having due regard to such probable use, and proportioned to the probable danger to persons so using its road.' " The above language from the opinion by Williams, J., is quoted with approval by the Supreme Court in the case of *Penso* v. *McCormick, supra,* 120, 121.

We are aware that there are expressions in some of the Indiana cases, especially in the case of *Cannon* v. *Cleveland, etc., R. Co., supra,* which seem to be in some measure out of harmony with the authorities adopting said middle ground. If the case just referred to is to be understood as holding that a railroad company for a long period of time may permit and acquiesce in the continuous use of its tracks at a particular place in a populous city by the public generally, including *children,* and yet incur no additional and corre-

sponding obligation to use care in the operation of its trains at such point, we think it is out of harmony with the great weight of authority in our own State as well as that of other jurisdictions. Some of the authorities make the duty to use ordinary care in such cases depend on whether the facts and circumstances of the particular case were such as to *indicate to the owner* or occupant of the premises that an injury to some member of the public might probably occur in case of his failure to use such care. *Penso* v. *McCormick, supra* 119, 123; *Young* v. *Harvey* (1861), 16 Ind. 314, 315; *Durham* v. *Musselman* (1827), 2 Blackf. 96, 18 Am. Dec. 133; *Graves* v. *Thomas* (1884), 95 Ind. 361, 48 Am. Rep. 727.

It does not follow from what we have said that a 14. railroad company is an insurer of the safety of children who come on its premises, either as licensees or trespassers, or that it at all times and at all places owes them the duty of any care. Its obligation is simply that which should attach and under the law "attaches to every member of society when he undertakes to exercise a personal right in a manner which may affect the welfare or safety of another member, the obligation of reasonable care * * * (and this) may, at times, seem to be a burden, but its enforced observance is never a wrong, whether applied to railroad companies or to individuals." *Edgington* v. *Burlington, etc., R. Co., supra* 422, 446. Reasonable care in such cases does not impose any duty where the presence of a child on its tracks is merely possible or where such duty or care imposes on the company an unreasonable limitation on the usual and ordinary use of its property. A correct and pertinent statement affecting this phase of the question will be found in the case of *Chicago, etc., R. Co.* v. *Krayenbuhl* (1902), 65 Neb. 889, 902, 904, 91 N. W. 880, 881, 883, 59 L. R. A. 920, where it is said: "It is true, as said in *Loomis* v. *Terry* [1837], 17 Wend. [N. Y.] *496, *500, 31 Am. Dec. 306, 'the business of life must go forward'; the means by which it is carried forward cannot be rendered absolutely

safe. Ordinarily, it can be best carried forward by the unrestricted use of private property by the owner; therefore the law favors such use to the fullest extent consistent with the main purpose for which, from a social standpoint, such business is carried forward, namely, the public good. Hence, in order to determine the extent to which such use may be enjoyed, its bearing on such main purpose must be taken into account, and a balance struck between its advantages and disadvantages. If, on the whole, such use defeats rather than promotes the main purpose, it should not be permitted; on the other hand, if the restrictions proposed would so operate, they should not be imposed. * * * Hence, in all cases of this kind, in the determination of the question of negligence, regard must be had to the character and location of the premises, the purpose for which they are used, the probability of injury therefrom, the precautions necessary to prevent such injury, and the relations such precautions bear to the beneficial use of the premises.''

In the last clear chance cases *knowledge* of the person in peril creates the duty on the part of the defendant to use ordinary care, and whether the knowledge which 2. creates such duty must be actual rather than constructive, under the more recent cases, depends on whether the person in peril is in a helpless condition. *Indianapolis Traction, etc., Co.* v. *Croly* (1913), 54 Ind. App. 566, 96 N. E. 973, 98 N. E. 1091; *Union Traction Co.* v. *Bowen* (1915), 57 Ind. App. 661, 103 N. E. 1096. An infant *non sui juris* on a railroad track, as was well expressed by Lairy, J., in the case last cited, is ''in a like situation with one whose foot is fast in a frog, or who for some other reason is powerless to extricate himself from the threatened danger by the exercise of care. As to such persons, it frequently has been held that a company operating cars on public streets owes the duty to discover their peril and to use reasonable care to avoid injuring them.'' We do not understand that these cases hold, nor do we desire to be understood

as holding, that the helpless condition of the child, or of the person with his foot in the frog, creates a duty to use ordinary care with reference to such person when no such duty existed before. That is to say, if there was nothing to charge the railroad company with knowledge of the presence or probable presence of the child on the track, its helpless condition would create no duty to exercise ordinary care in its favor, but the company being once charged with constructive knowledge of the probable presence of children on its tracks (as in the instant case) or charged with knowledge of the presence of the public generally on its tracks (as in the cases last cited) which necessarily includes helpless adults as well as helpless children, the knowledge of the presence or probable presence of those who are thus unable to help themselves necessarily carries with it knowledge of their helpless condition, and hence gives rise to a duty to use care corresponding to the emergency created by their helpless condition, and such care of necessity may be affirmative in character.

Constructive knowledge of the probable presence of the adult on the track in such cases charges the company with knowledge of his probable presence alone, and not with knowledge of his imminent peril; but being charged with the duty of looking and seeing it is also charged with knowledge of any helpless condition of the person in peril which such looking might disclose. Hence the distinction before indicated in favor of the child and helpless adult which imputes actionable negligence in their favor where there is only constructive knowledge of their presence on the tracks. So we say that the conclusion here reached is in perfect harmony with the reasoning of the last clear chance cases as expressed in our later decisions.

So likewise do the turntable cases expressly recognize that the duty of ordinary care where a child trespasser or licensee is involved imposes an additional affirmative care in favor of such child that does not exist in favor of an adult

trespasser or an adult licensee. It is conceded in these cases that in so far as the affirmative duty to lock or secure the turntable exists, that it exists in favor of the child only and not in favor of adults. The duty to use care in respect to children in such cases arises from constructive knowledge alone. The invitation which the law imputes to the owner of the premises in the turntable and attractive nuisance cases, in our judgment, is important for the reason only that it shows that when such owner locates his turntables at a place where children are liable to pass or congregate he knows that it will draw to it such children and hence should be charged with constructive *knowledge* of their presence or *probable presence,* and the *danger* likely to result to them on account of any failure of his to lock or otherwise safeguard such turntable, so that such children may not be exposed to its dangers.

As before indicated, it is the *knowledge* actual or constructive of the presence or probable presence on his premises of a helpless human being in peril that creates and gives birth to the duty of the owner thereof to use care, and in the instant case, whether the wheat under the cars could be said to be an attractive nuisance, and an implied invitation on appellant's part to children to come on its premises is not important, because such implied invitation, if it existed, as before stated is important for the purpose only of showing an excuse for decedent's presence, and a reason for charging appellant with constructive *knowledge* of his presence. The averments of the complaint show, and there was evidence from which the jury may have found that appellant had such constructive knowledge and hence, for the same reason that the owner of the premises should lock or guard an attractive nuisance thereon, appellant in this case should not have moved its cars without some warning or other act evidencing ordinary care towards decedent.

The last clear chance doctrine and the turntable doctrine are both recognized by the appellate tribunals of this State,

and whether appellee's decedent was a trespasser or a licensee by permission or by invitation, or whether the facts of the instant case bring it strictly within the particular class of cases to which either of said doctrines are generally understood to apply, for the reasons herein indicated, is not necessarily material. The fact remains that under the evidence the jury had a right to infer that appellant *had* constructive *knowledge of the presence of decedent in a situation of peril from which he was unable to extricate himself when it ran its cars over him and killed him* and hence the fundamental maxim and test for its application, which determines actionable negligence in all the exceptional cases herein cited, requires us to hold that appellant in this case owed to decedent the duty of ordinary care before moving its cars down upon him. There was evidence showing that it gave no signal or warning of any kind before moving its engine and cars. Under such evidence the question whether it exercised the degree of care that an ordinarily prudent person similarly situated would have exercised and whether the lack of such care was the proximate cause of decedent's death were questions of fact for the jury.

The question of contributory negligence on the part of appellee in trusting the decedent to the care of a twelve-year-old brother, and the question of the contributory negligence on the part of such younger brother, are also raised by appellant's brief, but on these questions there was evidence tending to support the averments of the complaint, and hence, under the authorities applicable thereto, such questions were clearly questions of fact for the jury.

Some question is also raised as to instructions given and refused but, if we are correct in our determination of the controlling question in this case, some of the instructions were more favorable to appellant than the law warranted and neither the giving, nor the refusal to give any of them

presents any error on which a reversal of the judgment below should be granted.

We find no error in the record and the judgment is therefore affirmed.

## ON PETITION FOR REHEARING.

HOTTEL, C. J.—Appellant has filed a petition for rehearing in this cause with briefs in support thereof in which it very earnestly insists that the court in its original opinion has run counter to the decisions of the Supreme Court and to all authority in all jurisdictions where the same facts have been before the courts, and that the opinion "declares a new rule of conduct". We assume that this statement is based on appellant's understanding of the facts of the case which, put in its own words as set out in such briefs, is as follows: "Stripped of all sentiment, the facts were that over the repeated objections of the appellant, men and boys at times did come upon its tracks at a place on its private highway between streets, not used as a highway or a playground, to steal wheat that dropped from cars and sell it; that decedent's custodian invited him on the tracks where there were ten stationary cars on a main lead, and later directed him to crawl under the ninth and tenth cars from a point where and at a time when appellant's employes were about to couple an engine and six cars to said ten cars; that decedent was killed while crawling under the cars while appellant's employes were engaged in the act of coupling; that appellant had one employe on the first of the backing cars and one walking ahead of the cut, and the engine bell was ringing; that the three boys were concealed under and between the ninth and tenth cars and were not seen by the employes of the appellant, and could not have been seen except by searching under and between the ten standing cars."

This statement could hardly be regarded as correct even if measured by the evidence most favorable to appellant, whereas the court in determining the ques-

tion it was considering in the opinion was required to look only to the evidence most favorable to appellee.

As stated in the original opinion our examination of the evidence convinces us that each material averment of the complaint had some evidence for its support. It is undisputed that appellee's decedent was killed, not on appellant's main line, but on a switch or side track which led from its main line along the south embankment of the canal of the Indianapolis Water Company across West Street and Blackford Street in said city to the manufacturing plant of Love Brothers. Both West Street and Blackford Street were public thoroughfares in said city, and the city of Indianapolis maintained a public park, called "Military Park", immediately north of said canal which was bounded on the north by New York Street, on the east by West Street, and on the west by Blackford Street. This park was in a densely populated part of the city, was supplied with amusements of various kinds, and matrons were kept in attendance to look after the children who came there to play. During the summer and autumn months children in great numbers congregated in the park and in its vicinity to play. The southwest corner of the park was within seventy-five feet of appellant's switch at the point where it crossed Blackford Street. The Acme-Myers Milling Company was located at this corner, and it was at or near this corner that appellee's decedent was run over and killed by one of appellant's cars. The car that ran over him was one of several wheat cars that had been placed on such switch in front of the milling company. Some of these cars had been unloaded and quantities of wheat had leaked from the cars, or in some manner dropped on the ground under such cars, and on the track near the cars. The leakage of wheat from cars on appellant's tracks at said point had been more or less frequent and continuous for a number of years, and there was an abundance of evidence showing that the children of the park and vicinity had been in the habit of fre-

quenting appellant's tracks at this point. They were frequently seen on and near such tracks at said point gathering up wheat and playing and fishing along the banks of the canal. The testimony of one witness on this subject as set out in appellant's original brief is in substance as follows: That he resided at 126 North Blackford Street and was employed by the Union American Cigar Company in the wholesale cigar business; that he had lived at his present address nine years; that he had seen children around the canal there fishing and around the railroad track; that the children fished from the trestlework over the canal and off the bank on the north and south side; that he also ''saw them after school take little baskets and go along the cars and gather wheat, and in the winter time and in the summer time often during the day I would be passing by and I would see them gathering wheat around the cars and on the tracks, where the leakage of the cars would be''; that ''they would carry brooms and a little basket and go along and sweep it up along the tracks. I have seen them there both when the cars would be standing there and when the tracks would be vacant and there would be nothing on the right of way''; that he had noticed this condition in the yards of the Acme Flouring Mill; that he had noticed children there in the morning, at noon and evening, and on Sunday; that there was no passage of trains on Sunday; that the people who gathered wheat ran from children to men; that he had seen eight or ten children on the right of way at one time; that the wheat he saw was a foot and a half or two feet outside the rails; that he never noticed any wheat between the tracks; that it was alongside where it had been swept or kicked out of the cars.

It is but fair to appellant to say in this connection that one of the custodians of the park testified that he had seen some of appellant's employes on different occasions drive the boys off the tracks and a member of the police force of Indianapolis testified to an occasion when some one (he

did not know whether boys or not) had broken one of appellant's cars on said switch, and ten bushels or more of wheat had run on the track, and on that occasion some railroad officer whom he did not know asked him to "assist him in trying to break up the *wheat stealing on the railroad*".

We have indicated enough of the evidence to show that appellant's switch track at the point where appellee's decedent was killed was located in a densely populated part of the city of Indianapolis and near one of the parks of such city which was habitually frequented by large numbers of children; that for a number of years prior to decedent's death the children of the park and its vicinity had been in the habit of going upon appellant's said track to gather up the scattered wheat thereon and to play and fish along the bank of the canal; that appellant knew or should have known of this custom.

The only serious conflict in the evidence on this branch of the case relates to the question whether the custom had been passively acquiesced in by appellant, and as there was some evidence tending to support the general verdict on this question this court is bound by such verdict. Therefore the law question which the court was required to determine was: Did appellant owe to appellee's decedent the duty of exercising toward him ordinary care at the time it moved its train against the car that run over and killed him? In our original opinion we answered this question in the affirmative and based our answer on the assumption that the facts of this case bring it within the rule therein set out as being the intermediate rule, and that the weight of authority in Indiana, and in a majority of other jurisdictions favor and follow such intermediate rule. We still believe that a careful examination of the authorities there cited will show our conclusion to be correct.

Appellant also says in its brief that: "Under the rule laid down by the court in this case, every property owner, before proceeding to perform any lawful work on his prop-

erty, must first dig out concealed intruders, and then patrol his premises to keep such persons out of danger.'' Upon a careful reëxamination of the opinion we can find nothing in it which can warrant such a construction. The opinion is expressly based on the theory that appellant owed to the decedent the duty of ordinary care only, and that under the facts of this case it was a question for the jury to say whether such duty had been performed by appellant.

It is true, that in discussing a proposition contained in appellant's brief that ''the owner or occupant of premises owes no *active* vigilance to one who enters upon such premises by mere sufferance, permission or passive acquiescence'', we stated, in effect, that, under the law, ordinary care where children *non sui juris* are involved may be different in kind and greater in degree than where adults are involved, and that such care, where the occupant of the premises knew that children *non sui juris* were present thereon and in a situation where they were likely to be exposed to imminent peril, might be affirmative in character, depending on the facts and circumstances of the particular case. This statement is supported by the authorities there cited. The opinion, however, nowhere asserts that the care necessary in any case is more than ordinary care; nor does the opinion anywhere attempt to indicate, or declare as a matter of law that any particular thing is necessary to be done in order to constitute ordinary care. The evidence on this branch of the case was not set out in detail, in the original opinion but it is expressly stated therein that ''there was evidence showing that it (appellant) gave no signal or warning of any kind before moving its engine and cars'', and that ''under such evidence the question whether it (appellant) exercised the degree of care that an ordinarily prudent person similarly situated would have exercised, and whether such lack of care was the proximate cause of decedent's death were questions of fact for the jury.'' It is true that one of appellant's witnesses testified that there

was an automatic bell ringer which was ringing when they went in to get the six cars, but this evidence is contradicted by other witnesses who testified that they heard no bell or warning of any kind. The switchman who made the coupling testified (we quote from appellant's original brief): ''That before attempting to make the coupling he had not made any effort to ascertain whether there were any boys under or about the cars; that when he was hanging on the car he could see all the way to Blackford Street; that he could not see on the south side of the cars; that he was watching the coupling and was not looking ahead to see whether any one was under or about the cars.'' Under such a state of facts this court could not say, as a matter of law that the appellant had used ordinary care to prevent injury to decedent. On the contrary the question was clearly one of fact for the jury.

We believe the original opinion is supported both by reason and authority, and hence see no reason for granting the rehearing. The petition for rehearing is therefore overruled.

NOTE.—Reported in 104 N. E. 785; 108 N. E. 375. As to, so called, attractive nuisances, see 59 Am. Rep. 23. As to the care required of railroad companies to prevent injuring small children on the track, see 25 L. R. A. 784. As to the duty to keep lookout for infant trespassers on track, see 8 L. R. A. (N. S.) 1079. As to the duty of the owner of premises to protect licensee against hidden dangers, see 17 L. R. A. (N. S.) 916. On the duty of a property owner to trespassing child, see 32 L. R. A. (N. S.) 559. As to the doctrine of "attractive nuisance" as applied to injury from cars, see 19 L. R. A. (N. S.) 1136. As to the application of turntable or attractive nuisance doctrine to standing railroad cars, see Ann. Cas. 1912 D 916. See, also, under (1) 3 C. J. 1409; 2 Cyc. 1013; (2, 13, 14) 33 Cyc. 773; (3) 29 Cyc. 442; (4, 6) 29 Cyc. 449; (5) 29 Cyc. 453; (7) 33 Cyc. 754; (8) 29 Cyc. 454; (9) 29 Cyc. 457; (10) 29 Cyc. 445; (11) 29 Cyc. 634; (12) 33 Cyc. 790, 802; (15) 33 Cyc. 903; (16) 29 Cyc. 1649; (17, 18) 3 Cyc. 348.